[No. 3718.   Decided November 15, 1900.]

JOHN RANAHAN, *Respondent, v.* H. C. GIBBONS *et al., Appellants.*

APPEAL—RECORD—NOTICE OF APPEAL—PRESUMPTIONS.

When it is manifest from the entire record that notice of appeal has been duly given in open court, the fact that the clerk's entries recite that appellants gave notice in open court that they "intended to appeal" will be presumed as inadvertently entered.

SAME.

The presumption arises from the fact that entry of a notice of appeal has been made that the clerk was directed by the court to make it, and it is unnecessary for the record to recite that the clerk was so directed.

EXCEPTIONS—SUFFICIENCY OF.

An exception to findings of fact, specifying them by number, is a sufficient compliance with the statutory requirement (Bal. Code, § 5052) that a party excepting must specify the part or parts excepted to; and the fact that the party excepting used the word "objection" instead of "exception," is immaterial, when the context makes it evident that he was urging an exception to the findings.

SAME.

Where exceptions to findings of fact and conclusions of law were duly made in open court and taken down by the court stenographer, but through oversight were not filed or noted on the margin or at the foot of the decision by the judge, as required by Bal Code, § 5052, it is within the power of the court, by *nunc pro tunc* order, to direct their filing and attaching to the findings as of the date of the findings.

ASSIGNMENTS OF ERROR.

An assignment of errors is sufficient when there can be gathered therefrom the points upon which the appellant relies for a reversal.

FINDINGS BY COURT—CONCLUSIVENESS.

Although the evidence may be conflicting, the findings of the trial court will not be allowed to control, when they are opposed by a clear preponderance of the evidence, or where the overwhelming weight of the evidence is in favor of the appellant.

CONTRACTS—MUTUAL ASSENT NECESSARY.

A proposition by appellant that, if respondent and a third party would buy certain mining claims and allow him a fourth interest therein, he would give respondent a fourth interest in all other claims located by him, would not constitute a contract until assented to by such third party; and, where a claim was located by appellant between the date of his proposition and the date of its acceptance and execution by the parties to whom it was made, respondent would not be entitled to any interest therein.

Appeal from Superior Court, Stevens County.— Hon. WILLIAM E. RICHARDSON, Judge. Reversed.

*S. & J. W. Douglas* and *Forster & Wakefield* (*W. M. Murray,* of counsel), for appellants.

*F. T. Post,* for respondent.

The opinion of the court was delivered by

WHITE, J.—The respondent brought this action in the court below against H. C. Gibbons, Bruce White, P. Burns and G. W. Walker, to recover an undivided one-

fourth interest in a certain mining claim, named the "First Thought," situated in Stevens county, and which was located by the defendants, Gibbons and Walker, on the 14th day of August, 1898. It is alleged in the complaint that the defendants Gibbons and Walker have made a contract to sell the claim to White and Burns, who are alleged to have contracted for the purchase of the claim, with full notice and knowledge of the plaintiff's rights in the claim. The case was tried before the court. When the trial was concluded, the action was dismissed as to the defendants Burns and Walker. A decree was entered in favor of the respondent, in which it was adjudged that the respondent was the owner of an undivided one-fourth of said mining claim, and that said Gibbons execute a deed therefor to the respondent, and in default thereof the clerk of the court, as commissioner, execute and deliver such deed, and that the respondent hold such interest free from any claim of the defendant White. This appeal is prosecuted by Gibbons and White.

The respondent moves the court to dismiss the appeal and affirm the judgment (1) because no notice of appeal has been given within the time or in the manner provided by law; (2) because no exceptions have been taken to the findings of fact and conclusions of law in the manner provided by statute; (3) because the appellants' brief contains no assignment of errors as provided by rules eight and twelve of this court. On April 20, 1900, at the close of the trial in this cause, the following entry was made by the clerk in the court records:

"The court, being fully advised, finds for plaintiff, and renders judgment for plaintiff as against Gibbons, and his rights to be protected as against White. Action as to Walker dismissed. To which ruling the defendants excepted in open court. Exception allowed, and defend-

17—23 WASH.

ants in open court gave notice that they *intended* to appeal to the supreme court of Washington from said judgment."

The statement of facts, certified by the judge who tried the cause, shows that at the close of the trial the defendants excepted and gave notice in open court of an appeal to the supreme court. On April 21, 1900, the following entry was made by the clerk in the court records:

. "Findings of facts and conclusions of law and decree herein were this day signed by the court. Immediately upon the signing of the above, defendants again gave notice in open court that they intended to appeal from said findings and conclusions and decree from the record and proceedings in said cause, to the supreme court of Washington, *and said notice of appeal is hereby entered.* And upon motion of defendants the court fixed the appeal bond at $2,000."

We think from this entire record it is manifest that the words "intended to" were inadvertently entered by the clerk in the court records; that the words "and said notice of appeal is hereby entered," in connection with "and upon motion of defendants the court fixed the appeal bond at $2,000," lead to that conclusion. If we are correct in this, there has been a sufficient compliance with the law relative to giving notice in open court of an appeal to the supreme court. It is not necessary for the record to recite that the court directed the clerk to make the entry of notice of appeal; that will be presumed from the fact that the entry has been made.

The record prepared at the request of the appellants and certified August 22, 1900, contained no exceptions, save the exceptions referred to in passing on the first part of this motion. On September 4, 1900, the judge who tried this cause made the following order, which was entered in the court below on September 7, 1900, viz:

"It appearing that exceptions to the findings of fact and the decree of the court were duly and properly taken by the defendants, Gibbons and Walker, in open court, at the time the findings of fact were signed, and that such exceptions were allowed by the court, but it appearing that such exceptions were taken down and noted by the stenographer by order of the judge, at the time, but were not filed or entered by the clerk, and it appearing also that the annexed exceptions is a correct transcript of the exceptions then taken, taken down and noted by the stenographer at the time and transcribed by him;

It is therefore ordered that the annexed exceptions to the findings of fact and the decree of the court in the above entitled action be filed and entered by the clerk of the court and attached to the findings as of the 21st day of April, 1900, with like force and effect, as if they had been filed or entered by the judge at that date. Dated this 4th day of September, 1900."

The exceptions filed and referred to in this order were as follows:

"Mr. Douglas:

The defendants except to each and every of the findings of fact, for the reason the same are not supported by the testimony in the case, and are contrary thereto, and are not the facts as the evidence adduced in this trial would support.

Except to the conclusions of law, each, every, and all of them, for the reasons that the findings of fact on which the same are based are insufficient to support the conclusions of law in this case.

Defendants except to the order of the court in that part incorporating in the decree in this case on the second page thereof, the following words: 'And it is further ordered that the plaintiff pay to the defendant Gibbons or to the clerk of this court,' etc.

(The findings of fact were then numbered by the court and the following exceptions taken by defendants.)

Mr. Douglas: I desire now to renew my objection to the findings of fact numbers 1, 2, 3, 4, 5 and 6, and to each and

all of them, for the same reasons, that I have stated heretofore. For the reason that the findings of fact so numbered and specified are not based upon the testimony introduced in this cause, and are not supported by the testimony introduced in this cause, and are not properly or sufficiently supported by the evidence, or any part thereof.

We except to the conclusions of law numbers 1, 2, 3, 4, 5, 6 and 7, and to each and every one and all thereof, for the reason that said conclusions of law are not supported by the findings of fact in this case, nor by the evidence upon which said findings of fact are based, nor the pleadings or issues joined in this case.

Defendants except to the decree in this case, and to the incorporation therein of the words on the second page, which are as follows: 'And it is further ordered that the plaintiff pay to the defendant Gibbons or to the clerk of this court,' etc.

Defendants except to this decree, for the reason that the same is not supported by the findings of fact or the conclusions of law in this case found, nor by the testimony introduced in the trial thereof, nor by the issues joined in the pleadings of this cause.

(The above exceptions were noted by the stenographer in open court, and entered in the minutes, by order of the judge, without any objection by counsel.)"

The statute (§ 5052, Bal. Code), provides that when a party excepts he shall specify the part or parts excepted to, and the judge shall note the same in the margin or at the foot of the report or decision. It appears from the order of September 4, 1900, that exceptions to the findings and decree were taken by appellants in open court at the time the findings of fact were signed, and that they were taken down and noted by the stenographer, who reported this case, by order of the judge, but by oversight they were not attached to the findings or filed; and the *nunc pro tunc* order of September 4, 1900, was for the purpose of filing them and attaching them to the findings, as of the date of the findings, as the act of the court. This order

was to complete the record according to the facts, and to supply an omission arising from the act of the court, and was clearly within the power of the court. When this record was supplied, the appellants, under § 6513, Bal. Code, had the right to bring it to this court, by way of a supplementary record, at any time prior to the hearing of the appeal. The respondent insists that no specific exceptions were taken to the findings of fact, because the language used was, "I desire to renew now my *objection* to the findings of fact numbers," etc. We think that the word "objection," taken in connection with the context, was equivalent to the word "exception," and that the "objection" of the respondent is hypercritical. There was an exception to each finding of fact and each conclusion of law. This court has held that an exception in general language to *all* the findings of fact and conclusions of law is insufficient, but it has never gone to the extent of holding that exceptions to the facts by number, as in this case, fall within that rule. When such exceptions are taken, the statute has been complied with.

The appellants, on page 19 of their brief, assign errors as follows:

"We contend: (1) That there was no agreement of any kind, or at all, concluded or entered into between Ranahan and Gibbons on the 6th of August, 1898, or at any time before the location of the First Thought; (2) that whatever talk was had between them was merely negotiary and amounted only to an offer or proposition, not a contract; (3) that the talk and proposition related only to the. Shea claims, and contained nothing whatever as to Ranahan having an interest in the future locations of Gibbons and Walker; and (4) that the proofs do not warrant the facts found by the court."

It sufficiently appears from these assignments what the appellants rely upon for a reversal, and this case does not

fall within the rule announced in *Perkins v. Mitchell, Lewis & Staver Co.,* 15 Wash. 470 (46 Pac. 1039). The motion to dismiss the apppeal is therefore denied.

As to the merits of the case: It is alleged in the complaint that on or about August 1, 1898, respondent entered into a contract with the appellant Gibbons to the effect that, if the respondent would purchase from Joseph Shea those mining claims in Stevens county known as "Whale," "Thrasher" and "Sword Fish," and procure the same to be conveyed to one J. C. Argall, or to the respondent in trust for Gibbons, Walker, Argall and respondent, he (the said Gibbons) would grant or convey to respondent an undivided fourth interest in said claims, and also an undivided fourth interest in any claims thereafter located by Gibbons or G. W. Walker, or both of them, in Pierre Lake mining district in said county; that said Gibbons represented to plaintiff that he had authority to act for said Walker in said matter, but that, if the said Walker repudiated said contract, so far as he (said Walker) was concerned, he (Gibbons) would make such conveyance to the respondent out of the interest acquired by said Gibbons through such locations; that on or about August 20, 1898, plaintiff caused the said three claims to be conveyed to said Argall, and that said Argall conveyed to respondent one-fourth of said three claims, and that the remaining three-fourths are owned by said Argall, Gibbons and Walker; that on or about August 16, 1898, said Gibbons and Walker located the mining claim in controversy; that the same was located under said agreement; that a demand has been made by the respondent on Gibbons that he execute and convey to respondent an undivided one-fourth interest in said First Thought, but Gibbons refused so to do, and claims that respondent has no right or interest in the same. There is an allega-

tion that White and Burns have contracted to purchase the claim with notice of respondent's interest, and that the claim is of great value, and that Gibbons is insolvent. Gibbons and Walker deny the making of the agreement set out in the complaint, and the insolvency of Gibbons, and notice to White and Burns. White denies any notice that respondent had any interest in the claim. The court found the facts to be as follows:

"1.   On the 6th day of August, 1898, the plaintiff made and entered into a contract with the defendant H. C. Gibbons, to the effect that, if plaintiff would purchase or bring about the sale of three certain mining claims in Pierre Lake Mining District, Stevens County, Washington, known as the "Whale," "Thrasher" and "Sword Fish," and belonging to one Shea, and procure the conveyance thereof to himself or one J. C. Argall, to be held in trust for defendants Gibbons, and Walker, and the plaintiff, and said Argall, that then and in that event, plaintiff should have an undivided one-fourth ($\frac{1}{4}$) interest in any and all mineral claims that might thereafter within a reasonable time, be located in said district by either the defendant Gibbons, or the defendant Walker, or both of them.

2.   That immediately thereafter plaintiff set about procuring by purchase the sale of said three claims belonging to said Shea as aforesaid, and afterward, on or about the 20th day of the month of August, 1898, completed the purchase of the same, by procuring the conveyance thereof by good and sufficient deed to said J. C. Argall, the said Argall then and there paying the amount of the purchase money to said Shea, to-wit, eighty-five dollars ($85), with the understanding and agreement on the part of the plaintiff that he should reimburse said Argall one-half ($\frac{1}{2}$) thereof, which he subsequently did within a short time; that the several parties in whose interest said three claims were purchased, as aforesaid, still have and hold their respective undivided interests therein.

3.   That very soon after the making of said contract between plaintiff and defendant Gibbons, said Gibbons

and defendant Walker, to-wit, on the 14th day of August, 1898, located in said mining district the 'First Thought' mining claim, which is in controversy herein, and is de scribed in the complaint; that said claim was then and there by said Gibbons and Walker duly and properly staked out and marked on the ground, as required by law, and proper and sufficient location notices were posted, as required by statute. * * *

4. That the location of said 'First Thought' mining claim, as aforesaid, was made by defendant Gibbons in pursuance of and under the terms of the contract made between him and plaintiff on the 6th day of August, as hereinbefore mentioned.

5. That the amount of assessment work required by statute was done and performed upon said claim by said Gibbons and Walker in the year 1899, and plaintiff has been ready and able to pay his proportion thereof, but said defendants have never made any demand upon him for the same or any part thereof. And, just prior to the service of the summons and complaint herein upon said Gibbons, plaintiff demanded of said Gibbons the execution of deed for plaintiff's interest in said claim, but said Gibbons then and there failed and refused to execute such deed, stating as a ground for his refusal that plaintiff had no right, title, or interest whatever in the property.

6. That sometime in the month of July, 1899, the defendants Gibbons and Walker gave a bond to defendant White for the conveyance to him of said 'First Thought' mining claim, together with three-fifths (3-5) interest in the 'Annex,' 'Defender,' and three-fourths (¾) interest in the 'Homestake' mining claims in said district, for the sum of twenty-five thousand dollars ($25,000), to be paid as follows: $2,500 in cash, $7,500 on or before January 24, 1900, and $15,000 on or before July 24, 1900, which payments were only to be made in the event that said White exercised the option contained in said bond; that $2,500 is all that has ever been paid upon said bond; that before said bond was executed, and before payment of the $2,500 was made as aforesaid, the defendant White had notice of plaintiff's rights in and to said 'First Thought' mining claim, as herein set forth."

Upon these findings the court filed conclusions of law as follows:

"1.   That plaintiff is the owner of an undivided one-fourth interest in and to said First Thought mining claim, and is entitled to a decree to that effect, as against defendants Gibbons and White.

"2.   That plaintiff is entitled to a decree requiring said Gibbons to convey an undivided one-fourth interest in said First Thought mining claim to him, and, in case of his default therein, that a commissioner may be appointed to make such conveyance.

"3.   That this case should be dismissed as to defendants Walker and Burns.

"4.   That the bond taken by the defendant White upon said property from his co-defendants does not affect the plaintiff's interest in said First Thought mining claim, and he is entitled to a decree to that effect as against White.

"5.   That plaintiff is entitled to his decree only after paying into the registry of this court, for the benefit of the defendant Gibbons, twenty-five dollars ($25), one-fourth of the assessment work done upon said property for the year 1899.

"6.   That plaintiff is entitled to judgment for costs as against the defendants Gibbons and White.

"7.   That lis pendens notice of the pendency of this suit, in form and substance as required by law, was duly filed in the auditor's office of said county on the 12th day of August, 1899."

On these conclusions, the decree set out in substance in the first part of this opinion was entered.

The First Thought mining claim was discovered and located by Gibbons and Walker in their own names on the 14th day of August, 1898. They at that time were, and prior thereto had been, associated together, engaged in the business of prospecting for minerals. Prior to August 6, they had become acquainted with three mineral claims in the Pierre Lake mining district, called the

"Whale," "Thrasher" and "Sword Fish," owned by one Shea, which they wished to purchase. It appears from the testimony of the respondent that he and Gibbons met in the streets of Bossburg on August 6, 1898, and had a conversation "about three claims that Mr. Shea owned out on Pierre Lake, or near Pierre Lake, * * * 'Sword Fish,' 'Thrasher' and 'Whale.' * * * On this date Mr. Gibbons told me [respondent] about these three claims that Mr. Shea owned, and said he thought it was pretty good property; and he asked me if I would go in with Mr. Argall and buy these three claims and give him and Mr. Walker a fourth interest each; if we would buy these claims, and give him and Mr. Walker a fourth interest each, he would go on the outside and whatever he could locate—(Interruption). He [Gibbons] told me [respondent] if Argall and I would go and buy these claims, and give he and Mr. Walker a fourth interest each, whatever *they* would locate on the outside we would be— (Interruption). Well, he [Gibbons] told me that if Mr. Argall and I would buy these claims—he said he thought he could get Argall to go in with me, and, if he could, if we would buy these claims and give him and Mr. Walker a fourth interest each, whatever they could locate on the outside Mr. Argall and I stood in for a fourth. So I asked him how that kind of a lay out would satisfy Walker, and he told me it would satisfy Walker all right. He said 'I picked him up on the road when he was packing his blankets.'— (Interruption). He [Gibbons] told me whatever he said went with Walker, because he picked him up on the road when he was packing his blankets and took him and kept him, and he said, so far as he was concerned, everything would be all right. I told him, 'I have not much money to go buying claims with.' I told him if we could buy the claims cheap it would be all right, I was agreed to it; so he said he

thought we could buy the claims pretty cheap.  So that is about all that was said.  *  *  *  Well, he [Gibbons] thought we could get some claims in the vicinity of Pierre Lake around where we were going to buy them claims,—enough to make a good, big group. . Q.  State whether that was the vicinity of where the First Thought was afterwards located.  A.  Well, it is immediately east of where the First Thought was located.  I think about a mile, or such a matter."  We have quoted all the testimony upon the part of the respondent as to any agreement between him and Gibbons prior to the time the disputed claim was located.  The conversation quoted constitutes the alleged contract.  There is no testimony whatever to support the allegation of the complaint to the effect that Gibbons had authority to act for Walker, and that, if Walker repudiated the contract he [Gibbons] would make a conveyance of one-fourth interest or any interest acquired by Gibbons through locations made by Gibbons and Walker.  There is no evidence showing that the alleged contract was ever made known to or acquiesced in by Walker, and, when the evidence was all in, the case was dismissed as to Walker.  There is no evidence to show that the "First Thought" was located in any other manner, or its location made by any other arrangements than had existed between Gibbons and Walker as to other locations prior to said alleged conversation of August 6, between Gibbons and respondent.

The fourth finding of fact, to the effect that the location of First Thought was made by Gibbons under the terms of the alleged contract of August 6, 1898, is not sustained by the evidence.  There is no testimony in the case showing that Argall knew of the alleged agreement, further than as the same affected the Shea claims.  Mr. Argall testified that on all claims located subsequent to the 20th of August, 1898, the respondent had a fourth interest;

that from the time they bought the property from Shea they considered themselves partners, and for that reason respondent got such interest, but that there was no agreement of any kind as to that, and that there was no contract arrangement or agreement between him and the respondent relating to a fourth interest of the respondent in the First Thought. As to the purchase of the Shea claims, Mr. Argall testifies:

"Well, Mr. Gibbons discovered this property of Mr. Shea's, and he came in and told me about it; he thought it was pretty good property, and he suggested me trying to— (Interruption.) He [Gibbons] suggested to me some way of buying Mr. Shea out. I told him I. could not go to Mr. Shea myself to buy it out. If I did, he would think it would be worth some money. Mr. Gibbons went to Shea himself. I don't know which Shea. It was one of the two [father or son]; and he said it would be worth $150 for the property. I told him I didn't want to put up that much money; he had been to him two or three different times, trying to get this property a little cheaper, and he could not do it. Then that was the time he got Mr. Ranahan to act with Mr. Shea. That is, Mr. Ranahan had went out and seen the property, and came in and told Mr. Shea that the property was not worth much. and he was to advise Shea to sell the property to me for whatever he could get. On the 20th of August Mr. Shea sold me the property for $85. * * * Mr. Ranahan was to receive an equal interest with me, and that was a fourth. * * * In the Sword-fish, Thrasher and Whale we were each to have a fourth interest in the property, provided we bought Shea out, and we were to furnish the money to offset what those boys [Walker and Gibbons] had done in finding the property. * * * Q. Just go on and state what other arrangements or agreements you had with Mr. Ranahan relative to any interest in this or the First Thought mining claim, if any. A. There was never any other agreement of any kind made between Ranahan or Mr. Gibbons, Walker, or myself."

The respondent testifies that on the 10th of August he saw Mr. Shea and told him that Mr. Argall wanted to buy his claims, and that on the 19th or 20th of August Shea came and told the respondent that he would go and see Mr. Argall, and that he [Shea] then went and saw Argall and Argall gave him $85 for the claims. The following question was asked Mr. Walker:

"State whether or not Mr. Ranahan was to be interested in any properties located or owned by you and Mr. Gibbons prior or before the purchase of the Shea claims. A. No, sir; there was no contract to that effect."

The following questions were asked Mr. Gibbons:

"Q. You may state whether or not prior to that (August 20, 1898) there was any agreement between you—or so far as you know, between Mr. Walker and Mr. Argall, that Mr. Ranahan was to be interested in any other claims (Shea claims) than those three. A. Not that I ever knew of, sir; not with me. Q. You made no such agreements? A. No, sir; not on my account. Q. Did Mr. Ranahan at that time, or, so far as you know, at any other time, have any interest in the First Thought? A. Never, sir."

The respondent testifies that on August 15, 1898, when at the request of Argall he went out to inspect the Shea claims, he saw Mr. Gibbons at Gibbons' camp and Gibbons showed him some rock from the First Thought, and said it was a claim they had located the day before in Gibbons' and Walker's names, and that he (the respondent) had a fourth interest in it under the agreement; that he went back to Mr. Argall on the 15th to report about the Shea claims, and that on that day he says in his testimony, on rebuttal, he told Argall about the First Thought location, and said he (Ranahan) "was in on it," and Argall said, "Yes, of course, we are both in on it." Argall denies this conversation, or that he knew anything about the First Thought being located until about August 28, 1898.

At the time the respondent says this conversation took place, August 15, 1898, Argall had not purchased the Shea claims, did not know what Shea would ask for the claims, and he did not negotiate their purchase from Shea until five days after August 15th, all of which appears by the testimony in chief of the respondent. It is not likely that such a conversation took place, because at that time the event had not happened—and there was no certainty that it would happen—upon which the respondent and Argall would become entitled to such interest as responded claimed. There is testimony, other than the respondent's, tending to show that Gibbons admitted that the respondent had an interest in the First Thought. Argall in May, 1899, got a deed for a one-fourth interest in the First Thought, presumably for supplies furnished by him for development work. The only testimony with regard to the contract is that of the respondent and Gibbons, who says no such contract was made, and Walker and Argall, who both explicitly testify that the contract had no reference of any kind to the future locations of Gibbons and Walker. Argall was not a party to this suit, and Walker was dismissed as a party by the court because he knew nothing of the alleged contract and was not bound thereby. This testimony is of higher value and entitled to more weight than that of either the respondent or Gibbons, who are the parties in interest. It is a significant fact that no one except the respondent ever heard of such a contract, or anything out of which to construct one, or any talk about future locations, until the commencement of this suit, and then only the assertion of the respondent, made for the first time in his complaint, that Gibbons, in the talk of August 6, offered that if he and Argall would buy the Shea claims, they could have an interest in future locations. Whatever the contract was, Walker and Argall were parties to it and must have known its terms.

If respondent was contracting as to one thing, and the other parties as to different things, there was no contract at all, for there was no meeting of the minds of all the contracting parties. Another significant fact is that when the pleader drew the complaint in this action it was with a view that, if the alleged contract could not be established, Gibbons alone could be held; for after alleging the contract the pleader concludes that Gibbons represented that he had authority to act for Walker, and that if Walker repudiated the contract he (Gibbons) would make a conveyance of a one-fourth interest to plaintiff out of the interest acquired by Gibbons in such locations. There was offered no proof whatever to sustain this latter allegation. Stronger, however, than the assertions or denials are the acts of the parties, especially the respondent. Ranahan knew on the 15th of August, according to his testimony, that Gibbons and Walker had located the First Thought on the 14th, the day before; knew at the time of it that Gibbons and Walker were doing work on the claim, or having it done, and expending money on it; yet he never asserted an interest in it, or inquired about his title, or examined the location notice or the record as to it, and had even forgotten the name of the claim until he heard, in July or August, 1899, that White was dealing for the property. The parties were working together from time to time, they were interested together in various claims where assessments and assessment work was settled between them, and yet never did the respondent mention the fact that he claimed an interest in this location, and never did he offer to pay or work his share until upon the trial of this action he found that he must do so in order to obtain a decree. While claiming an interest in all future locations by Gibbons and Walker by virtue of the alleged contract of August 6, the respondent went out with them and worked in locating other

claims, the same as one having no such contract. He never demanded an interest or a deed to an interest in the First Thought until after the summons and complaint in this action had been issued, and at the time and on the same day they were served. On the other hand, the conduct of Gibbons, Walker, and Argall was at all times consistent with their testimony. Respondent was never asked to do any assessment or other work on the claim, or to pay any part of the same or of other expenses. He was never recognized as a part owner of the claim in dealing with the claim, although as to other claims located after August 20, 1898, and purchased from Shea, his interest was well known and recognized by all the parties. It does appear that Gibbons and Walker in September, 1898, were trying to sell the property to one Haskins. The respondent had something to do with the negotiations, but only as an agent. He was promised by Gibbons and Walker a share if he made the sale; but that sale was not made. The evidence as to this matter, instead of showing a recognition of a title in him, distinctly shows to the contrary. There was no agreement in force between the parties on the 14th of August, when the First Thought was located. The proposition of August 6, 1898, was conditional that Argall should join in the venture and the Shea property be bought. On the 13th of August, Argall had not yet assented to the proposition, and told Ranahan that he would not buy the Shea claims until he (Ranahan) went out and examined them. The respondent testifies: "On the 13th of August, when Mr. Argall came down to me and wanted me to go and look at these claims he bought of Mr. Shea, he said he would not buy them until I went out and examined them; it was the 13th, about noon. I told him I could not go on that day, and I would go on Monday; so I went on Monday, the 15th." The respondent further testified that Shea never went to see

Argall about selling the claims until the 19th or 20th of August.    On the 20th of August, 1898, when Argall bought the Shea claims, he assented for the first time to the enterprise, so far as the proof shows.  Upon the 14th of August, 1898, when the First Thought was located, the matter touching the purchase of the Shea claims was only a proposition; the minds of the parties had not met; there was no agreement; and until the 20th of August, 1898, it was conditional upon their being able to purchase from Shea; until that time it was merely an offer.

The findings of the trial court will not be disturbed on appeal, when the evidence is conflicting, unless the weight of evidence is clearly against them.  *Washington Dredging & Imp. Co. v. Partridge,* 19 Wash. 62 (52 Pac. 523). But such findings cannot be allowed to control when they are contradicted by a clear preponderance of the evidence (*Roberts v. Washington National Bank,* 11 Wash. 550, 40 Pac. 225), or where the overwhelming weight of the proof is in favor of the appellant (*Allen v. Swerdfiger,* 14 Wash. 461, 44 Pac. 894).  The clear preponderance and overwhelming weight of the evidence in this case is in favor of the appellant Gibbons.  But, as a question of law, the facts as to the terms of the alleged contract proven by the respondent, considered in their most favorable light, do not sustain the first and second findings of fact, the conclusions of law thereon, and the decree of the court.

As we have already suggested, there was no contract at the time when the First Thought was located.  The conversation of August 6 had not then ripened into a contract; it amounted to nothing more than an offer or proposition by Gibbons to Ranahan; it was oral and conditional.   The proposition was that Ranahan and Argall should buy the Shea claims.   Argall had not then been consulted.   His assent or acceptance of the proposition

18—23 wash.

was necessary to give it the effect of a contract; until he consented there was no meeting of minds. The proof is certain that neither he nor Ranahan had made up their minds on August 15th, after the claim in question was located. There is no proof as to when he did accept, until and except that he purchased the Shea claims August 20th. Until then it had not, and could not have, any of the effect or force of a contract. And then, too, the offer of Gibbons, even as stated by Ranahan, that "If we [Ranahan and Argall] would *buy* these claims   *   *   * whatever they [Gibbons and Walker] could locate on the outside, Mr. Argall and I [Ranahan] stood in for a fourth," was dependent and conditional not only upon Argall's consenting to enter upon the venture, but upon the ultimate *purchase* of the Shea claims, which might never have been accomplished. Until these conditions were complied with, which was not until August 20th, Gibbons was not bound by that promise. The promise, if made at all, did not become effective until the conditions on which it depended had been fully performed. No time was fixed within which the Shea claims should be bought, or within which Gibbons and Walker should commence to locate claims under the proposition. It is not reasonable to suppose that the parties, or either of them, intended to tie their hands and suspend their energies for an indefinite time, pending a proposition which might or might not, at the election of either, at some uncertain future time, ripen into a contract, and which might be defeated despite the efforts of both, either by the refusal of Argall to join in the enterprise, or of Shea to sell his claims. The dependent and conditional promise was not a contract when the disputed claim was located; Gibbons was not bound by it, and Ranahan acquired no interest in the claim by reason of it. These conclusions are amply sus-

tained both upon principle and by authority. There was nothing in the conversation of August 6, 1898, between respondent and Gibbons, obligating the respondent to make any effort to secure the Shea claims. Respondent in effect said he would not go into the arrangement unless he could buy the Shea claims cheaply.

"It is unquestionably true as a general proposition, that a contract cannot bind the party proposing it, and indeed there is no contract, until the acceptance of the offer by the party receiving it is in some way, actually or constructively, communicated to the party making the offer." 1 Parsons, Contracts, 483.

Unquestionably, Gibbons might have expressly agreed, in the event of the purchase of the Shea claims, to give to the respondent a fourth interest in all claims located on or after the 6th of August, 1898. But there is no proof of any such express agreement.

"The court will look into all the circumstances of each case, and inquire what the parties actually understood or intended, or, regarding them as rational men, what they must be supposed to have intended." 1 Parsons, Contracts, 483.

Applying this rule to this case, and conceding that the conversation of August 6, 1898, between Gibbons and the respondent, took place as testified to by the respondent, we think that it was intended thereby only to express that if respondent purchased, or secured through Argall, the Shea claims, then, on the happening of that event, thereafter, in all claims located by Gibbons and Walker, the respondent should have a fourth interest. The claim in controversy was located before the happening of the event indicated, while Gibbons and Walker were pursuing their ordinary business, without any knowledge whatever that the respondent had opened up negotiations for the purchase of the Shea claims, and six days before these claims

were purchased. So far as the same relates to the First Thought mining claim, the findings of fact, except the third, are not sustained by the evidence, and the conclu-sions of law and decree based thereon cannot be upheld.

The judgment and decree entered herein is reversed and set aside, and this action is remanded to the court below, with instructions to dismiss the same at the cost of the respondent; the appellants to recover the costs of this appeal.

. DUNBAR, C. J., and REAVIS, FULLERTON and ANDERS, JJ., concur.